IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rels. | ) | |
| JOHN MELSON and | ) | |
| KENNETH SMITH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case Number: 1:12-cv-00389 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| JORGE SCIENTIFIC CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS JOHN MELSON AND KENNETH SMITH'S
MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION TO STRIKE AMENDED COMPLAINT**

Defendant's motion to strike is nothing more than a transparent attempt by Jorge to avoid responsibility and hide its rampant fraud, illegal conduct and misbehavior occurring over a period of years.  Defendant's motion seeks to butcher the amended complaint, shredding it into separate pieces taking out all of the steam and putting out the hottest fires, rather than taking responsibility for its wrongdoing.  Under the liberal pleading standards and the strict motion to strike standards, a defendant should not be permitted to eviscerate a thorough and detailed amended complaint.  It is clear that Jorge seeks to strike material provisions of the complaint only to then argue in its motion to dismiss that the complaint lacks 9(b) particularity.  Jorge's transparent and misguided strategy must certainly fail.

A court may grant a motion to strike when the matter to be stricken is *wholly unrelated* to the allegations in the complaint and is *prejudicial*.  The fact that Jorge engaged in scandalous conduct when violating the False Claims Act cannot excuse Jorge from being required to respond

to plaintiffs' factual allegations which together tell a story of violations of material provisions of Jorge's contracts with the Army. The real scandal is Jorge's knowing and reckless disregard for U.S. law, Army procurement regulations, and U.S. military orders which were material to the government's decision to contract with Jorge. Relators filed an amended complaint precisely to satisfy the heightened pleading standards of Rule 9(b), and to incorporate additional evidence obtained from witness testimony, documents, and videographic evidence in connection with Relators' *qui tam* investigation. That these revelations are unpleasant and harm Jorge's reputation should not preclude Relators from making a *prima facie* case under § 3729(a)(1) and 3730(h). *See Gateway Bottling, Inc. v. Dad's Rootbeer Co.,* 53 F.R.D. 585, 588 (W.D. Pa. 1971) ("The facts here may be unpleasant for [the movant] to have on the record and they certainly contain charges of reprehensible conduct but the same is true of many facts of life which are entitled to be pleaded as relevant to a cause of action or a defense."). Defendant's motion to strike should therefore be denied as it fails to show how Relators factual allegations are entirely unrelated to the allegations in the complaint. Relators should be permitted to make a prima facie case.

## I.    Legal Standard

### A.  Motion to strike

Motions to strike are rarely granted. A "motion to strike is considered an exceptional remedy and is generally disfavored…." *United States* ex rel. Pogue v. Diabetes Treatment Centers of America, 474 F.Supp.2d 75, 79 (D.D.C. 2007) (citing *Larouche v. Dep't of Treasury,* 2000 WL 805214 at *13 (D.D.C. Mar. 31, 2000). For a motion to strike to be granted, the matter to be stricken must have absolutely no bearing on the subject matter of the litigation, *Corbell v. Norton*, 224 F.R.D. 1, 2 (D.D.C. 2004) (citing *Ulla–Maija, Inc. v. Kivimaki,* 2003 WL 169777, at *4 (S.D.N.Y.2003), and be prejudicial to the defendant. *Nwachukwu v. Karl,* 216 F.Rd.D. 176,

178 (D.D.C. 2003).  Courts will strike portions of a complaint only if the challenged allegations are so unrelated to the present claim as to be void of merit and unworthy of consideration. *Geschke v. Air Force Ass'n*, 2002 WL 31253746  (D.C. Ill. 2002).

Rule 12(f) must be read in conjunction with the liberal pleading standards of Rule 8. *Simmons v. Nationwide Mut. Fire Ins. Co.*, 788 F.Supp. 2d 404, 407 (W.D. Pa. 2011); *Gov't Guarantee Fund v. Hyatt Corp.*, 166 F.R.D. 321, 324 (D.V.I. 1996) *aff'd sub nom. Gov't Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 95 F.3d 291 (3d Cir. 1996).  A court should not strike a pleading unless the insufficiency is "clearly apparent,"  *Cipollone v. Liggett Group, Inc.*, 789 F.2d 181 (3d Cir. 1986), *rev'd in part on other grounds*, 505 U.S. 504 (1992). Rule 12(f)  motions to strike are largely disfavored, and the court must "draw all reasonable inferences in the pleader's favor and resolve all doubts in favor of denying the motion to strike." *Nwachukwu,* 216 F.R.D. at 178 *(*citing *Wailua Assocs. v. Aetna Cas. & Sur. Co.*, 183 F.R.D. 550, 553–54 (D.Haw.1998); *Joe Hand Promotions, Inc. v. Neko*s, 18 F.Supp.2d 214, 218 (N.D.N.Y.1998); *Seibel v. Society Lease, Inc.*, 969 F.Supp. 713, 715 (M.D.Fla.1997).

### B.  False Claims Act Retaliation

To establish a prima facie case of False Claims Act retaliation, a plaintiff must allege that: (1) the employee engaged in protected activity "in furtherance of an action under [the FCA]", (2) the employer knew of this action, and (3) the employer retaliated against the employee as a result of his protected conduct.  31 U.S.C. § 3730(h)(1).  In 2009, Congress amended the FCA to extend protection to acts "in furtherance of…other efforts to stop 1 or more violations of this subchapter."  *Id.*  Prior to this amendment, repeated court decisions had narrowed the FCA, so Congress amended the statute to explicitly expand protected activity and replace overly narrow judicial interpretations.  *See* H.R. Rep. No. 97, 111th Cong., 1st Sess. 5 (2009) ("Unfortunately, since the 1986 amendments were enacted, several court decisions have

limited the reach of the False Claims Act, jeopardizing billions in Federal funds . . . Since the

1986 amendments, courts have also limited the scope of the False Claims Act's anti-retaliation

provisions.").

Legislative history further indicates that Congress drafted the statute with the intent that

protected activity would be broadly defined after courts had narrowed the statute. *See* S. Rep.

No. 507, 110th Cong., 2d Sess. 6 (2008) ("[I]t is important that the Committee revisit the FCA

and correct erroneous court interpretations that have limited the scope and application of the

FCA in contravention of Congress's intent in passing the 1986 Amendments."); S. Rep. No. 345,

99th Cong., 2d Sess. 34, reprinted in 1986 U.S.C.C.A.N. 5266. "'[P]rotected activity . . . includes

any 'good faith' exercise of an individual 'on behalf of himself or others of any option afforded

by this Act, including investigation for, initiation of, testimony for, or assistance in an action

filed or to be filed under this act.' . . . Protected activity should . . . be interpreted broadly."). In

the 2009 amendment, Congress specifically added the broadening phrase "lawful acts done . . . in

furtherance of . . . other efforts to stop 1 or more violations" to:

> make clear that this subsection protects not only steps taken in
> furtherance of a potential or actual qui tam action, but **also steps**
> **taken to remedy the misconduct through methods such as**
> **internal reporting to a supervisor or company compliance**
> **department and refusals to participate in the misconduct that**
> **leads to the false claims**, whether or not such steps are clearly in
> furtherance of a potential or actual qui tam action.

155 Cong. Rec. E1295-03 (statement of Rep. Berman) (emphasis added).

### C. Fraud under the False Claims Act

The elements of a FCA claim include (1) that the defendant made a false statement or

engaged in a fraudulent course of conduct; (2) that the defendant carried out such statement or

conduct with the requisite scienter (or intent); (3) the statement or conduct was material; and (4)

the statement or conduct caused the Government to pay out money or forfeit money due. *See*

*United States ex rel. Sanders v. N. Am. Bus Industries, Inc.* 546 F.3d 288, 297 (4th Cir. 2008).

Among the categories of fraud, actionable false claims are: (1) claims for products or services not provided to the Government, (2) material misstatements on a bid or request for payment, including inflating the amount of a claim.

In order for a claim to be actionable under the FCA, it must be factually or legally false. *Tobiko*, 811 F.Supp.2d at 45. A claim is factually false if it invoices for services that were not rendered or incorrectly describes goods or services provided. A claim is legally false if it contains an express false certification, or when a claim falsely certifies compliance with a particular statute, regulation or contractual terms, where compliance is a prerequisite for payment. *Id.* A claim may also be legally false under the FCA under an implied certification theory, "where the government would not have paid funds to a party had it known of a violation of a law or regulation, and 'the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent.'" *Id.*

## II.   Argument

### A.   Jorge improperly seeks to strike questions of fact that if true support relators claims of violations of General Order 1 and fraud under the FCA

Contractors working in Afghanistan are required to follow the terms of their contract in addition to military regulations, United States, and Afghan law. One of these directives is Army General Order 1 ("GO1"). Ex. 1. GO1 is a compulsory and applies to Jorge's Legacy, CAAT, and NAT contracts. General Order 1 prohibits consumption of alcohol and the possession, sale, transfer or use of mind altering drugs. Ex. 1. GO1 also prohibits the use of unauthorized weapons and prohibits the use of firearms when it is not necessary to the mission or used in self-defense. *Id.* In the First Amended Complaint ("FAC"), Relators describe with detail specific violations of General Order 1 including illegal weapons use, alcohol and drug use, illegal

operation of a vehicle while intoxicated, and assaults on Afghan nationals.  Relators allege

specific instances where Jorge violated General Order 1, and realtors amended their complaint to

supplement details learned by relators in the course of their qui tam investigation.  The amended

complaint details Jorge's gross misconduct and violations of law, which followed from Jorge

management including Chris Sullivan, Executive Vice President, Chris Garvin, Program

Manager, Erik Miller, Security Manager, Ryan Hoffman, Operations Manager, and others

including Jeffrey Sykes, USG Program manager, who later became a Jorge employee.  Jorge

managers including the individuals listed above, drank massive amounts of alcohol while they

were supposed to be working on government contracts and protecting the Villa from armed

attack.

Jorge's motion to strike aims to rewrite the complaint to water down details of Jorge's

fraud and retaliatory abuse.  For example, at ¶ 124 of the amended complaint, Relators allege

that "on November 2011, Derrick Wilson and other Jorge employees threw a party with a cash

bar."  Wilson, a Jorge employee, served as Security Manager in charge of maintaining the

security protocols of the compound.  Instead, Wilson not only violated Jorge's policies against

alcohol use, but he also profited off of violations of GO1 by running a cash bar, and encouraged

other contractors and members of the military to violate GO1 by selling them alcohol.  Relators

allege that GO1 was a material condition of Jorge's contracts with the Army.  The amended

complaint spells out violations of General Order Number 1 and the consequences to the US

Mission in Afghanistan.  Relators' complaint shows a pattern of harassment and retaliatory abuse

aimed at Relators and other Jorge employees who complained to Jorge about the misconduct.

Finally, the amended complaint explains the consequences of Jorge's knowing violations of

Army regulations including but not limited to GO1 detailing physical injuries suffered by Jorge

employees and Afghan nationals as a result of Jorge's knowing violations, and the threats of

Afghan Intelligence (National Security Directorate) raids on the Jorge compound.

Jorge falsely certified compliance with General Order 1 and knowingly violated its

prohibition on alcohol use and sales.  Jorge should not be permitted to downplay this incident by

striking the fact that at Wilson's party up to "fifty (50) people attended, including U.S. military

personnel."  ¶ 124.  Both Jorge and U.S. military personnel are required to follow GO1.  *See* Ex

1. Jorge can deny these allegations in its answer, but it should not be permitted to avoid

responding by striking this fact from Relators' false certification FCA claim.  *See* FAC at ¶ 289

(alleging that Jorge "fraudulently induced the U.S. government into exercising the government's

option(s) on the contracts, by knowingly misrepresenting or omitting material facts regarding the

existence of a present or past fact with the intent of causing the government to rely on its

representations in deciding whether to extend the Legacy contract(s).).

Jorge now seeks to avoid being held accountable for its unlawful behavior by striking key

provisions of Relators Amended complaint.  Jorge's motion begins by referring specific

individuals such as Jeffrey Sykes and Chris Sullivan who engaged in reprehensible conduct in

Kabul. Def. Mot. to Strike at 6.  Nowhere in the amended complaint do Relators allege that Jeff

Sykes is a "drunk" or a "womanizer" as the motion to strike concludes.  The complaint instead

lists facts regarding the Sykes' behavior for the purposes of identifying specific violations of

GO1, including alcohol and drug use, conflicts of interest, illegal weapons use, property damage,

and a pattern of retaliatory treatment which forms the basis of Relators' §§ 3729(a) and 3730(h)

claims.  Sykes' history of having sexual relationships with women who work for Jorge, is

relevant to showing conflicts of interests, and violations of GO1.[1]  "womanizing" as defendants Not only was Chris Sullivan as Executive Vice President beyond scrutiny, but the contract depended on "keeping Mr. Sykes happy."  ¶ 68.  Other incidents of harassment and retaliation have a direct bearing on Relators' allegations of harassment and Jorge's consistent failure to enforce its corporate policies.

The proposed amended complaint included with Defendant's Motion to Strike goes much further in removing wholesale allegations of fraud and retaliatory abuse.  Jorge's motion to strike shreds the complaint into segments of incomprehensible sentences and fragments, which after being deprived of any meaningful detail, no longer make sense.  Here are but a few examples of specific examples of violations of General Order 1, which Jorge asks to the court to strike:

### Chris Sullivan's Drug Use

As early as October 2011, Chris Sullivan was abusing Oxycodone, a highly addictive and powerful narcotic used to treat pain.  ¶ 126.  This fact is significant not only because it is in itself a violation of GO1, but it explains how Jorge's conduct at the Villa rapidly spiraled out of control due to lack of oversight and leadership by this Jorge senior executive.  Section 5 of GO1 prohibits individuals "from introducing, possessing, selling, transferring, manufacturing or using any chemical, product, or substance with the intention of **obtaining an altered state of mind** or an unnatural feeling of euphoria."  Ex. 1.  Sullivan by his own admission was "blacking out" because he was taking 100 Oxycodone pills per week while consuming copious amounts of alcohol.  ¶ 126.  The complaint explains that drugs such as Oxycodone were readily available, and that Sullivan directed Kevin Carlson, the Medic, to keep such drugs unlocked in a pantry in Carlson's bedroom for employees like Sullivan to access whenever they wanted, and without

---

[1] *See* FAC at ¶215 alleging that Sykes, a member of the military who was in charge of overseeing Jorge contracts, and Shepherd, a Jorge employee, had a sexual relationship.

seeing a doctor.  ¶¶ 100-101.  The dangers of taking an excessive number of Oxycodone pills while drinking alcohol in a warzone where weapons are easily accessible should be obvious, yet Jorge blatantly violated this prohibition.  The consequences of Jorge's willful violations of General Order 1 were severe.

In October 2011, while Chris Sullivan was taking Oxycodone and drinking heavily, Sullivan placed a loaded handgun into Jorge employee Aawes Zahed's mouth and said, "This boy is my nigga." ¶ 121.  Alarmed, Jay Schneider, a member of the U.S. military, had to take Sullivan's gun away from him.  *Id.*  The next day, Smith confronted Sullivan about the incident and told him that such conduct has to stop.  Sullivan responded that he "had no recollection of the event," and that he must have blacked out after taking 100 oxycodone pills. ¶ 122.  Since Sullivan was the second highest official at Jorge after the CEO, nothing happened either at a corporate or military level to prevent the unauthorized use of weapons or drugs until Jorge learned of Relators' lawsuit.

General Order 1 prohibits the unauthorized use of weapons and requires that individuals authorized to carry weapons keep them holstered and only use them when it is essential to a mission or necessary for self-defense.  *See* Ex. 1.  Sullivan often carried his Glock unholstered in the back of his pants.  ¶ 257.  Sullivan also carried a knife and, on one occasion,  while under the influence of alcohol, threw the knife toward Smith only missing Smith by inches.  ¶ 123.  On January 15, 2012, Sullivan violated General Order 1 by consuming alcohol and oxycodone and throwing live ammunition into the fire pit while drunk and high.  ¶ 186. Melson witnessed the incident and retreated into the Villa to take cover from bullets exploding in the fire.  Sullivan yelled after Melson, "you're a pussy for leaving." ¶ 192.  Shrapnel from one of the detonating bullets sliced through Zahed's forehead just missing his eye.  If the shrapnel had hit Zahed a

centimeter lower, the blast which would have surely blinded him.  ¶ 186.  Later that month, when

Sullivan learned that Zahed had not reported this event, Sullivan awarded Zahed a bonus.  ¶ 190.

Remarkably, Jorge's proposed amended complaint asks the court to strike this entire

account of drug induced violence from the record.  Sullivan's use of oxycodone and the

consequences thereof have direct bearing on Relators FCA claim because it shows clear

violations of GO1, a directive that was material to Jorge's Legacy Contract.  By Jorge's own

admission, General Order 1 is a condition of its Legacy contract, *Def. MTD* at 13-14, a condition

which Jorge knowingly violated.  *See United States v. Kellogg Brown & Root Services, Inc.*, 800

F.Supp.2d 143, 154 (D.D.C. 2011) (citing *Mikes v. Straus,* 274 F.3d 687, 698 (2d Cir.2001)

("An express false certification occurs when a claimant explicitly represents that he or she has

complied with a contractual condition, but in fact has not complied.").  Sullivan's reckless

conduct also violated Jorge's weapons authorization requirements, and the military's guidelines

on the use of force.

Jorge's motion seeks to exclude fundamental elements of Relators' express false

certification claim before Relators even have an opportunity to present admissible evidence.

Provisions of a complaint should not be stricken unless it is completely irrelevant and "has no

possible bearing on the subject matter of the litigation."  *See Corbell*, 224 F.R.D at 2.  Any

questions regarding issues of fact or law should be construed against the movant.   5C Fed. Prac.

& Proc. Civ. § 1382 (3d ed.) (When in doubt "many district judges have concluded that the

motion to strike under Rule 12(f) should be denied and the sufficiency of the allegations left for

further elaboration through discovery and adjudication by summary judgment or a trial on the

merits.")  There should be little doubt that the complaint alleges that Sullivan's substance abuse

was in violation of GO1, a material condition of Jorge's contracts.  Sullivan's reckless disregard

for the safety of others, and subsequent retaliation by harassment leading up to the Relators'
constructive discharge are on point and directly relevant to Relators FCA and retaliation claims.
Sullivan was the ringleader in the partying and used his position of authority within Jorge to
enable a free for all drug and alcohol induced no holds barred party atmosphere with zero
accountability.  Jorge seeks to hide Sullivan's conduct, and the company's shameful response by
striking entire events from a well pled complaint before discovery commences.

    The Motion to Strike also removes portions of the complaint vital to Relators' retaliation
claim under § 3730(h).  The motion seeks to strike Sullivan's harassment when he publically
referred to Smith and Carlson as "butt buddies" on a whiteboard.  FAC at ¶ 129.  Not only is the
adverse action of harassment, which is prohibited by 3730(h), crossed out, the Motion to Strike
also asks the court to remove Smith's protected activity by excluding the fact that Smith
confronted Sullivan about Sullivan's reckless and illegal use of a firearm.  Def. MTS Ex. 1 ¶ 121
(Def. Proposed Am. Cmpl.)  On January 16, 2012, Smith told Sullivan that the partying had to
stop, and that the NDS was threatening to raid the Villa.  Protected conduct is an element of
Smith's § 3730(h) claim, yet Jorge argues the court should adopt such a liberal interpretation of
Rule 12(f) to strike issues of material fact that Smith confronted Sullivan to oppose Sullivan's
violations of GO1.  Jorge's motion fails to meet the requirements of Rule 12(f) that the facts
alleged above "have no bearing on the subject matter of the litigation."  *Corbell*, 224 F.R.D. at 2.
Jorge's motion to strike should therefore be denied.

### Jorge was complicit in Jeffrey Sykes misconduct including physical assault

    Jeffrey Sykes was instrumental in obtaining additional funding for Jorge.  Sullivan's
connections with Sykes allowed Jorge to get off Camp Eggers and establish an off-base Villa
funded by the Army.  ¶ 59.  In the course of Relators' *qui tam* investigation, Relators uncovered

evidence that, as early as the summer of 2010, Sykes and other Jorge managers violated General

Order 1.  At that time, Jorge shared its facilities in Green Village with a subcontractor called

New Century.  While Jorge was prime on the Legacy contract, its subcontractor New Century

provided the actual mentors to train the Afghan police.  Jorge provided mentors with protection

and support.  The amended complaint details Jorge's response to complaints in the field from

New Century and from Jorge employees.  Even though Sykes may not have been on Jorge's

payroll at the time, Jorge's failure to respond to complaints of sexual harassment and physical

assaults show retaliatory animus and an ineffective HR department which during Relators' tenure

failed to do anything about the reported fraudulent conduct.

During the summer of 2010, Jeff Sykes and other Jorge managers working on the Legacy

Contract were partying at Green Villa and drinking alcohol past 3 a.m.  When a New Century

HR Manager asked Sykes to quiet down, Sykes took out his firearm and threatened her.  Sykes

told the woman that he would have the HR Manager "PNG'ed" (persona non grata) the next day.

When the HR manager went to Jorge, the company did nothing.  Sykes was untouchable.  As

promised, the next day, the New Century HR Manager was sent home despite her complaints to

Jorge and New Century management.  FAC at ¶ 65.  This section of the complaint shows Jorge's

complicity in Sykes illegal conduct as Jorge employees and Sykes were consuming alcohol in

violation of GO1, illegally using weapons, and physically assaulting employees.  Sykes was

supposed to be overseeing the contract and enforcing government regulations, but instead took

Jorge's misconduct to new levels and insulated Jorge from accountability from the contracting

officers at the Army Research Laboratory.  Sykes paved the way for abuses of General Order 1

and covered Jorge's tracks from the Army contracting officer back in the United States.

In addition to Jeff Sykes lack of oversight, this account also shows the lack of seriousness to which Jorge handled complaints of gross misconduct and specific violations of military regulations, U.S. law, and Jorge's own internal policies as enshrined in the Jorge corporate handbook and code of ethics.  This account is relevant to Relators' claims because it disproves Jorge's argument that Realtors' complaints of violations of GO1 and other regulations and policies were isolated and only occurred over a period of months.  Ex 2.  In fact, Jorge's behavior was widespread, took place over several years, and went unchallenged even though Jorge was well aware of what was happening in Kabul.

On another occasion, Relators learned in the course of their *qui tam* investigation that Sykes and several Jorge employees including Garvin, and Wilson went to Gandamack Lodge, a speakeasy that provided alcohol to contractors and military personnel.  Sykes started a fight with an Afghan national in order to prove that he could knock out a larger Arab man.  General Order Number 1 prohibits the following:

> h.  Respect for Afghan Culture and Religion.  Words, gestures and acts that are disrespectful to Afghans, their cultural practices, or their religious beliefs are likely to have a significant negative impact on the mission and endanger the safety of United States and Coalition forces in Afghanistan.  Any word, gesture or act directed act, conveyed to or made in the presence of any Afghan citizen by United States or Coalition Forces, DoD civilians, or DoD contract personnel with the intent to insult, disrespect or degrade Afghan citizens, their culture, or their religious beliefs is prohibited.

Sykes approached an Afghan national and made various insults related to the Afghan's sexual orientation intending to provoke a physical confrontation and prove to the Jorge employees that he could "knock out a larger Arab man."  ¶ 70.  Sykes continued to provoke the Afghan by referring to the man as a "raghead."  *Id.*  Eventually the conflict became physical and Sykes punched the Afghan in the face, threw him down a flight of stairs and broke the Afghan's nose.  *Id.*  Relators contend that not only was this in violation of section 5(h) of General Order 1, but it

also shows that Jorge employees were complicit in violations of GO1, and the misconduct predates Relators employment.

Jorge's motion to strike fails to establish that the above account is wholly unrelated to Relators complaint for retaliation and falsely certifying compliance with GO1. Jorge's misconduct and retaliatory abuse predated Relators employment, and Jorge continued its pattern of fraud and retaliation after Relators' constructive discharge.

## Ryan Hoffman's government paid trip to Thailand

Jorge seeks to strike Ryan Hoffman's government paid trip to Thailand from the Amended Complaint even though Hoffman's travel had no legitimate government purpose and instead was an excuse to engage in drunken debauchery which included paying for prostitutes. FAC ¶ 161. In December 2011, Schneider, Zahed, Hoffman, and Sykes went to Thailand. While there, Ryan Hoffman lost his passport and could not return to Afghanistan for several weeks until a replacement passport was issued. *Id.* Consequently, the Legacy contract was left without an operations manager for a substantial period of time. ¶ 265. This supports Relators' claim that Jorge's continuous drinking rendered them unable to perform under the contract. Hoffman's case was only one instance where the Villa was understaffed, and in this case for no other reason than Hoffman's illegal conduct.

The fact that Hoffman had his passport stolen by a Thai prostitute is relevant to showing the extreme misconduct of Jorge employees, and how Jorge used U.S. taxpayer dollars to take trips to Thailand with the intent to sleep with prostitutes and violate the laws of the United States. Jorge's illegal conduct extended far beyond the Villa and the United States government paid for many of these expenses through costs submitted for reimbursement through the Legacy contract. FAC ¶161. Relators intend to put forward evidence to prove that Hoffman used government money to travel to Thailand, that it was not for governmental purposes, and

14

Hoffman's illegal actions caused him to lose his passport, which was material to Jorge's ability to perform its obligations to the government under its Legacy contract.  Jorge seeks to strike issues of fact that are highly relevant to substantiating Relators' claims of fraud and retaliation and should therefore be denied.

**Legacy Program Manager Chris Garvin violated General Order 1**

Chris Garvin served as program manager throughout Smith and Melson's employment with Jorge.  Garvin served as Relators' direct report, and in late 2011 Garvin engaged in violations of GO1.  Without at the time knowing Garvin's own violations of the GO1, Melson pled with Garvin to put a stop to Sullivan's frequent parties which led NDS officials to threaten to raid the Villa.  Garvin explained that he knew about Sullivan's partying and told Melson to "hang in there." FAC ¶¶ 176, 244 In the course of Relators *qui tam* investigation, Relators learned that Garvin too violated General Order 1 along with Howell, Miller, and Sullivan. *Id.* at ¶143.

Smith and Melson reported to Garvin that the NDS threatened to raid the Villa. FAC at ¶ 171.  Melson disclosed Jorge's violations of General Order 1 including the threat of an NDS raid to Garvin, before Melson resigned.  ¶ 297.  Only days after Melson emailed Garvin, Melson was issued a formal counseling notice by Miller.  FAC ¶207.  The counseling notice shows pretext that Jorge was attempting to force Melson out of the company for reporting Jorge's knowing violations of General Order 1.  The standard for retaliation does not require Melson to have known about the FCA only that Jorge's conduct had the possibility of being fraudulent and put the company on notice of the actions which constitute the fraud. The counseling notice and harassment noted in Melson's communications with Garvin serve the basis of Melson's retaliation claim.

Garvin was also implicated in violations of GO1. In December 2011, Garvin witnessed yet another bar brawl this time instigated by Derrick Wilson ("Wilson").  Wilson, Garvin, and Sykes instigated a bar brawl at a local speakeasy called "Bacaccios" after a patron allegedly insulted Miller.  *Id.* at ¶ 140.  Wilson broke his hand in the fight and lost his Department of Defense issued contractor identification.  *Id.* at 141.  Garvin, Miller, and Sykes took out their weapons and held the entire bar at gunpoint while they attempted to locate Wilson's ID.  *Id.* at ¶ 142.  That same night, Garvin told an American girl at the bar who, according to Garvin, "kept running her mouth," that Wilson, Sykes, Miller, and Garvin, were "the type of guys who would put a bullet in your head, leave you in a ditch somewhere and then go and have dinner."  *Id.* at 143.

After the brawl at Bacaccio's, agents from the Army Criminal Investigative Division ("CID") came to the Villa.  The next day, in or around December 6, 2011, Eric Miller lied to CID agents to protect Jeff Sykes and keep him out of the investigation.  Wilson instructed Jorge employees to lie and obstruct CID's investigation by telling CID that Wilson had left the country even though Wilson had really stayed in Afghanistan with his girlfriend known by Villa residents as "band girl."[2]  Sullivan and Miller orchestrated a cover up to hide weapons which they knowingly possessed and knew to be illegal.  Miller and Sullivan, who were in the United States at the time ordered Relators to "sanitize" the house of all drugs, alcohol and grenades, which were illegal for contractors to possess.  *Id.* at ¶ 147.  Miller and Sullivan ordered Smith and Melson to pack a Pelican case containing all of Jorge's unauthorized grenades, and distribute them to soldiers who were authorized to possess grenades.  *Id.* at ¶ 148.

---

[2] The woman was a member of the U.S. military and nicknamed "band girl" by Villa residents because she was the singer of a band that played at a party Wilson hosted at the Villa in November 2011.  Over 50 people attended the event and there was a cash bar. ¶ 124.

This account is directly relevant to Jorge's violations of GO1 and Smith and Melson's claims of retaliation.  Garvin and Mille instructed relators to cover up and hide weapons from CID and make false statements to Army CID.  These facts are directly relevant to Relators protected activity and the underlying fraud occurring at the Villa.

<u>**Jorge Scientific violated General Order 1**</u>

Jorge's motion to strike alleges in conclusory fashion that the amended complaint is replete with details that are immaterial to the pleaded causes of action.  Jorge then continues to list several allegations that in fact directly relate to the fraud.  Relators address each of these aspects in turn:

- "sexual relationships were frequent and ongoing at the Villa, involving various military, civilian, and foreign personnel."   Jeffrey Sykes, who was responsible for overseeing the contract had a sexual relationship with a Jorge employee, Christina Shepard in violation of General Order 1, government procurement regulations and Jorge's ethics policy concerning conflicts of interest.  Sykes relationship with Shepard is relevant because it shows the conflict of interest between Jorge and the Sykes, the COTAR. Unmarried sex is also a violation of General Order 1.  *See* Ex. 1.

- "the partying was frequent, occurring on average 4-5 times per week.  The parties were characterized by gunshots (in violation of General Order 1, U.S. regulations concerning the use of force, and contrary to any sense of public safety), extremely loud music, burning of furniture (destruction of property paid for by the government), and physical horseplay often involving weapons or fire extinguishers"

- Ms. Rawlings and Raymond Brooks, Director of Operations for Jorge, went to Dubai with Sykes, Sullivan and Garvin and drank alcohol with them."  This is a significant fact

because the COTAR Sykes was offered a position at Jorge;  Elizabeth Rawlings was also aware of the violations of GO1 at the Villa.  Rawlings visited the Villa and was drank heavily;

- New Century became increasingly intolerant of Jorge managers drinking excessive quantities of alcohol on the job, wrestling, and drug use that Sullivan and Sykes set up a new Villa for Legacy and NAT contract personnel.  This is significant to showing that Jorge's reason from moving to the Green Village to the Villa was to create a party house where laws and regulations could be violated with impunity

- "one bonfire at the Villa was so large it melted the courtyard's lighting and damaged a wall including security cameras."   Not only did Jorge get paid by the government to drink on the job and throw parties nearly every night, but in doing so Jorge destroyed property funded by the government through the cost reimbursement provisions of the Legacy and NAT contracts.  Having massive bon fires in the middle of Kabul was against the Villa SOP which required Jorge to maintain a low profile to avoid drawing an attack.  The bon fires often were so large that they damaged the courtyard wall and destroyed the cameras.  This equipment in addition to the plates, glassware, patio furniture, and the fire itself was incinerated in the fire and these costs were billed to the government.  The cost was significant as the cost of firewood alone was over $12,000.

- Drunk driving by Jorge employees and military:   it is a violation of General Order 1 to operate a vehicle while intoxicated

- NDS officials threatened to raid the Villa in response to Jorge's violations

**B. Jorge improperly seeks to strike questions of fact that support relators claims of retaliation under the False Claims Act**

Jorge should not be permitted to rewrite Relators' complaint by striking significant details which support key elements of Relators' claims of serious fraud and retaliation committed by Jorge management. In Jorge's proposed amended complaint, Jorge requests that the court remove the fact that Chris Sullivan, the Executive Vice President of the Company wrote on a whiteboard at the Villa that Smith "was a homosexual." ¶ 127. Jorge goes further asking the court to strike out the following paragraphs of continuing abuse by Sullivan such as calling Smith and Carlson "butt buddies." ¶ 129. Defendant in or about November 2011, Sullivan harassed relators because they would not partake in the fraud, i.e. violations of General Order 1 such as the illegal discharge of weapons, detonating ammunition in the fire, and destruction of property. A motion to strike cannot eliminate details of Sullivan's harassment which was directed at Relators and is central to their retaliation claim.

Relators allege that Jorge knowingly violated General Order 1 when the company's management drank alcohol, abused narcotics, and destroyed property funded by the government while in Afghanistan. FAC ¶¶ 279 – 290. Relators allege that these violations in themselves were violations of the Legacy, CAAT, and NAT contracts, and outlined specific occasions when Sullivan, Sykes, Hoffman, Miller, and Schneider's conduct endangered Villa residence and neighboring Afghans. Jorge seeks to strike details such as the fact that the Villa was chronically understaffed when Jorge managers went to Dubai and Thailand. Jorge managers took several vacations to Dubai and Thailand at the government's expense, "to sleep with prostitutes and drink alcohol." FAC ¶¶ 264, 267. Jorge's proposed amended complaint makes little sense once entire paragraphs are removed and portions of sentences deleted. Motions to strike must state exactly which matter must be stricken and the movants grounds for striking the material. Jorge

intends to use the motion to strike as a vehicle to remove factual allegations that if removed weaken Relators' claim of fraud. Removing issues of fact from a well-pled complaint is completely inconsistent with Rule 12(f).

Jorge asks the court to strike the fact that Chris Sullivan instructed employees coming to Afghanistan, a dry country where alcohol was prohibited by law as well as by Army General Order Number 1, to smuggle as many bottles of liquor as possible into the country.   ¶ 35 This is a material fact that contributes to Relators allegation that Jorge knowingly violated the terms of their contract.  Jorge may contest this fact, but it is wholly inappropriate for a motion to strike which requires the alleged matter be stricken to have "no possible bearing on the subject matter of the litigation."  *Corbell*, 224 F.R.D. at 2.

Throughout 2011 and into 2012, Relators allege that Sullivan, Hoffman, Miller, and Sykes would purchase patio furniture and firewood, bill the government for these costs, and then light the furniture on fire damaging security cameras and the walls of the Villa.  Glassware was also smashed in the fire pit and projected over the wall into the NDS compound and repeatedly replaced and billed for reimbursement.  Relators possess evidence of the property damage and burnt patio furniture; however, Relators should not be forced to produce such evidence at the pleading stage.  Jorge's argument that destruction of property paid for by U.S. taxpayers is wholly unrelated to the subject matter of this litigation is without merit.   Similarly, the fact that the fires were so large that they could be seen over a wall at least 30 feet high surrounding the Villa shows Jorge's failure to follow its own Statement of Protocol regarding security measures for the Villa and the need to maintain a low profile to avoid security threats.

Relators were forced to resign because of the severe safety violations and breach of protocol Jorge managers enabled at the Villa.  This was not only fraud, because it was expressly

prohibited in the Legacy contract, but it was also a threat to their safety.  Jorge failing to respond

and take relators continuous objections to the conduct seriously forced Relators to resign.

The motion to strike, if granted, would hinder plaintiffs' ability to respond to the simultaneously

filed motion to dismiss.  Defendant filed this motion to strike and a motion to dismiss on the

same day.  Relators amended their complaint specifically to address Rule 9 considerations and

defendant's purported defenses based on information obtained during a thorough investigation,

including documentary evidence, and the statements of several witnesses.  The Court should

permit, and in fact encourage, Relators to put forth their best, most thorough statement of their

claims.

       Jorge has made several statements in the media that they have cleaned up their act,

investigated and put an end to the fraud.  Despite acknowledging "wrongdoing" Jorge claims that

the fraud was confined to a small number of people and that Jorge acted quickly to resolve the

matter.[3]  The Amended Complaint directly contradicts this purported defense and tells the entire

story of Jorge's fraud.  From evidence which relators obtained by direct observation, documents,

and witness statements, Relators have now filed a very detailed and thorough complaint that

fully addresses Jorge's fraud, illegal conduct and retaliation.  The simple fact that Jorge does not

like how it is portrayed in the complaint, does not mean that it should be permitted to strike the

allegations.

       Jorge failed to stop the fraud prior to the initiation of this lawsuit.  Instead they acted to

hide the illegal conduct lying to Army CID, obstructing their investigation, moving grenades,

and illegally obtained weapons to other locations, and all the while continuing to consume

massive amounts of alcohol, destroy property funded by the United States, and degrade the

---

[3] See Exhibit 2 Statement from Chris Torti, president and CEO, Jorge Scientific.  Official Statement from Jorge
Scientific updated 11.21.12.

reputation of U.S. soldiers in Afghanistan.  Plaintiffs amended complaint alleges significant details of violations of General Order 1, including severe alcohol and drug abuse, unauthorized weapons purchased from the black market, illegal use of firearms and grenades.  When the Army attempted to investigate, Relators' supervisor obstructed an Army investigation into criminal abuses of Army's code of conduct.  Jorge's violations are shocking and outrageous, but detailing these facts in an amended complaint is not scandalous within the scope of Rule 12(f) because they are directly relevant to Relators claims.

Jorge's strategy is clear:  take each of the allegations in a piecemeal fashion, label them as scandalous and assert that in and of itself is not fraud, and request that the court strike the allegations from the complaint before Plaintiffs even have a chance to present evidence of their validity. Instead of viewing each specific fact in a vacuum, the Court should construe each allegation in the greater context of Relators' charges of fraud and retaliation.  While a specific fact might seem irrelevant standing alone, in context, the allegations taken as a whole, paint a picture of illegal conduct and retaliation.  The Court should not permit Jorge to pick apart the amended complaint in a piecemeal fashion because it does not like some of the more revealing allegations.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion to Strike should be denied.

                         Respectfully submitted,

                                 /s/
                         David Scher, DC Bar No. 474996
                         R. Scott Oswald, DC Bar No. 458850
                         The Employment Law Group, P.C.
                         888 17th Street, NW, Suite 900
                         Washington, DC 20006
                         (202) 261-2803
                         (202) 261-2835 (Fax)
                         dscher@employmentlawgroup.com
                         soswald@employmentlawgroup.com

                         *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2013, a copy of the foregoing was served by the

Court's ECF system on the following:

Jennifer A. Short
Assistant United States Attorney
555 Fourth Street, NW
Room E 4415
Washington, DC 20530
jennifer.short@usdoj.gov

Michael Schatzow, DC Bar No.185447
David Feinberg, DC Bar No. 982635
VENABLE LLP
575 7th Street NW
Washington, DC 20004
mschatzow@venable.com
dfeinberg@venable.com

Respectfully submitted,

/s/
David Scher, DC Bar No. 474996
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, DC 20006
(202) 261-2803
(202) 261-2835 (Fax)
dscher@employmentlawgroup.com